**Kurt S. SPEHR, Plaintiff,**

v.

**THE UNITED STATES, Defendant,**

**No. 99–340 C.**

United States Court of Federal Claims.

Nov. 30, 2001.

Lawrence Klepetko, Sarasota, Florida, attorney of record for plaintiff.

Kent G. Huntington, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

OPINION

LYDON, Senior Judge.

Plaintiff was a serviceman on active duty in the United States Coast Guard from 1983 to 1992. Plaintiff alleges that he was wrongfully discharged in 1992 in violation of his constitutional rights and applicable military

1. Prior to his Coast Guard service, plaintiff had four years of active duty and five years of reserve

regulations and/or that his discharge was legally ineffective because the Coast Guard did not follow required procedures. Plaintiff claims that he is entitled to back pay, benefits and allowances from the date of his discharge to the present, the correction of his military records, retirement at a higher rank, certain medical assistance, as well as a total of $1.8 million in damages for violations of his rights under federal law and the 5th and 14th amendments to the U.S. Constitution, additional "special damages," and attorney fees. Defendant contends that the court lacks subject matter jurisdiction over any part of this action except the narrow review of the Coast Guard's administrative discharge of Mr. Spehr—based on the finding of a "personality disorder"—to determine whether appropriate procedural safeguards were followed and whether the decision was rational. The case is before the court on plaintiff's motion for summary partial judgment and defendant's partial motion to dismiss and cross motion for judgment upon the administrative record. For the reasons discussed hereinafter, the court denies plaintiff's motion for summary partial judgment and grants defendant's partial motion to dismiss and cross motion for partial summary judgment. The case is dismissed in its entirety.

FACTUAL BACKGROUND

Plaintiff, Kurt Spehr, enlisted in the U.S. Coast Guard on December 1, 1983, for a term of four years. Two years later, on November 29, 1985, he reenlisted for a term of six years.[1] Spehr became a radarman first class (RD1) at the pay grade of E-6. During his service years there were a number of incidents reflecting negatively on plaintiff's job performance and interaction with fellow servicemen. These incidents led the Commander of the Coast Guard Group in Key West, Florida, Robert Scobie, on March 4, 1991, to order the convening of an administrative discharge board to consider whether Spehr should be discharged from the Coast Guard prior to the end of his enlistment term (November 29, 1991). The administrative dis-

duty in the U.S. Navy.

charge board was comprised of three Coast Guard officers—a Commander (the senior member) and two Chief Warrant Officers. The board held a two-day hearing on June 3–4, 1991, at which Spehr appeared, was represented by counsel, and presented testimony by several witnesses. The hearing concluded with a recommendation from the board that Spehr be separated from the Coast Guard, with an honorable discharge, on account of his "unsuitability due to a personality disorder."

On August 2, 1991, the administrative discharge board issued a report presenting its findings of fact and its opinion that Spehr had a personality disorder which had manifested itself throughout his Coast Guard career. The pertinent factual findings for the purposes of this litigation, which are supported by the administrative record, were as follows:

(1) On June 1, 1984, just six months into his initial term of enlistment, Spehr reported to a Coast Guard clinic in Portsmouth, Virginia, complaining about "feelings of anxiety around conflicts and superiors." The preliminary assessment of the medical doctor was that Spehr was suffering from an "adjustment disorder." He was referred for counseling. On May 29, 1985, after a year and a half of service aboard the Coast Guard cutter "Taney," Spehr was referred by the ship's executive officer, Lt. Commander Smith, to the clinic in Portsmouth, Virginia, once again, this time for a psychiatric evaluation. In a medical record entry that same day it was reported that Spehr alleged he had received death threats while on duty and that the commanding officer wanted him dismissed from the Coast Guard. On August 23, 1985, Spehr was transferred to another duty station in Galveston, Texas. In the fall of 1986, after failing to qualify as a vessel traffic controller, Spehr was assigned to another Coast Guard cutter, the "Chase."

(2) In August 1988 Spehr was reassigned to the Coast Guard's mobile aerostat program (MAP) in Key West, Florida. Within a month of his arrival at Key West Spehr "reacted inappropriately" (and belligerently) to Coast Guard personnel trying to help him with housing and financial matters. On Sep-

tember 9, 1988, Spehr received a negative report from his commanding officer (CO), Lt. Ronald Kochan, for tardiness in relieving a watch, failure to obtain proper training for his duties, and for "inappropriate behavior/reaction to being placed on report." On September 26, 1988, the Navy's Family Service Center referred Spehr to a Navy clinic in Key West for "something to calm him down." Spehr "complained of explosive anger and verbal abuse towards his wife and children." A medical officer assessed him as having "an adjustment disorder with borderline personality traits." Citing the testimony of several fellow servicemen, the board found that Spehr worked for four supervisors over a two-year period and had difficulties with all of them. With two of the supervisors Spehr exchanged "threats and wholly inappropriate remarks." Spehr created "tension" and "distrust" between himself and his co-workers by sometimes "react[ing] inappropriately to innocent or best intentioned remarks."

(3) On July 28, 1989, Spehr was given a letter of admonition from the Coast Guard for disobeying a lawful direct order from a superior and departing his place of duty. He was relieved of all duties and privileges associated with his decision making and authority in the MAP Key West chain of command. "Administrative remarks" by his commanding officer (Lt.Kochan) which accompanied the letter of admonition, discussed a host of shortcomings in Spehr's performance. They included failure to obey orders given by proper authority, a disrespectful and argumentative manner with superiors, difficulty in communicating ideas and giving direction to subordinates, a sometimes abrasive personality which leads to personal confrontations, inability to master the demands of his work, a constant need for guidance, misinterpreting constructive criticism as personal attacks, lack of leadership and a common sense approach to problem solving, consistently blaming his mistakes on outside factors beyond his control, and refusing to take responsibility for his actions.

(4) In August 1989 Spehr's commanding officer referred him to the Navy's Family Service Center for counseling. On September 5, 1989, Spehr went to the Navy clinic in Key

West complaining of insomnia. The medical doctor assessed the problem as an adjustment disorder, prescribed some medication, and advised Spehr to continue with counseling. By November 17, 1989, Spehr completed a total of 14 counseling sessions, which focused on raising Spehr's self-esteem and improving his ability to handle job-related stress. The Navy counselor reported that Spehr had "constructively engaged in the counseling experience" and could be expected to improve his job performance and interpersonal relationships. On May 29, 1990, Lt. Kochan reinstated Spehr's privileges with respect to decision making and authority at MAP Key West. Kochan noted that Spehr's performance over the past several months had "steadily and significantly improved." He attributed this improvement to "a positive attitude, hard work, and redirected effort," in addition to the counseling and training he had received.

(5) On November 20, 1990, Spehr reported to the Coast Guard clinic at Key West complaining of neck pain. He indicated that the pain was related to a physical altercation with his superior officer while on ship duty 11 days before (stemming from a recommendation/log entry Spehr had made in reference to an upcoming storm) in which the officer allegedly "tried to kill him." The clinic did not discern any symptom that warranted a medical officer's attention. Spehr's allegation that his superior officer tried to kill him was referred to Lt. Kochan, who requested an informal investigation. The investigation confirmed that an altercation had occurred, but found that it was inadvertent and that the officer in command never intended to inflict bodily harm on Spehr.

(6) On November 23, 1990, Lt. Kochan wrote a memorandum to the Coast Guard's medical services command on Key West which related the information he had about the incident between Spehr and his superior officer. The superior officer, Kochan indicated, admitted to physically removing Spehr from the MAP operations center, but asserted that he had no intention of causing bodily injury to Spehr. According to Lt. Kochan:

"Spehr's perception of people wanting to harm him concerns me. He has indicated in the past that at least two other MAP personnel wanted to kill him..... I believe he is convinced someone/everyone is 'out to get him'. [The four superior officers to whom Spehr has been assigned since reporting to MAP in August 1988] [a]ll describe his behavior as a 'Dr. Jeckel [sic]/Mr. Hyde' personality. Due to his erratic behavior, mood swings, and interpersonal relationship problems. I referred him to [counseling] in AUG 89..... I have witnessed only temporary positive changes in RD1 SPEHR's behavior since that counseling, mostly when he is given specific projects where he can work alone and which require no leadership skills or personal interaction.

Basically, I believe RD1 Spehr is a good person. He appears to be a good family man, participating in various social and church functions. He also presents a sharp appearance and performs most administrative functions very well. His problems seem to center around lack of self-esteem and self-confidence, which invariably affect his decision making ability and interpersonal relations."

Lt. Kochan closed his memorandum by requesting "a medical/psychological screening and treatment to ascertain the status of Spehr's physical and emotional state."

(7) On December 4, 1990, Spehr was advised in a letter from his commanding officer, prepared on a standard "Administrative Remarks" form, that he was being placed on probation for six months and recommended for a psychiatric evaluation to determine whether he had a personality disorder making him unsuitable for service in the Coast Guard. Lt. Kochan cautioned Spehr that he was not obligated to let the probationary period run its full course, and that if Spehr did not show improvement there would be "prompt action to separate you from the service." The letter discussed Spehr's poor performance record and the areas in which Kochan expected to see improvement. Under the heading "Temper and Interpersonal Relationships," Lt. Kochan wrote that:

"you simply lack the control and temperament expected of a normal adult. Any perception on your part that coworkers or

supervisors are not giving adequate consideration to your suggestions or recommendations brings about a temper tantrum. This includes, but is not limited to: shouting, stomping around, gesticulating wildly with your hands and arms, and slamming around small items close to hand. This is totally unacceptable in close confines of a shipboard environment for 27 day patrols..... Less dramatic, but no less unpleasant to your superiors and coworkers are periods of sullen hostility that usually follow one of your outbursts."

Under the heading "Judgment / Compliance with Lawful Orders," Lt. Kochan wrote that:

"you seem to think you have an option to obey a lawful order when given. Since reporting aboard, you have been assigned to four different team leaders, all of whom have voiced similar complaints about your violent, unpredictable temper, and poor judgment demonstrated by constantly questioning lawful orders. In order to avoid provoking an outburst by you, they have to devote unnecessary time figuring out how to express their desires is such a way as to gain your cooperation or avoid your ire.

.... [Y]ou spend numerous hours of unproductive time, even in very trivial .... matters, attempting to locate .... written material proving your superiors incorrect. While it may be commendable to attempt to ensure we do things right, in no case is it justifiable to delay carrying out the lawful order of a superior until you feel you've adequately researched the matter."

In summing up Spehr's performance record at MAP Key West since August 1988, Lt. Kochan wrote that Spehr had demonstrated many problems in his interpersonal relations that could have warranted disciplinary action.

"In some instances, you properly could and should have been punished, but weren't. I incorrectly justified your inappropriate behavior on your low self-esteem and did not hold you fully accountable for your actions. I also gave you the benefit of the doubt since you voluntarily participated in counseling, which indicated you were doing everything in your power to rectify the situation. Unfortunately, since the counseling,

I have seen only temporary, sporadic improvement..... No more special consideration..... Future misconduct, including tantrums or overt hostility towards your coworkers and superiors will result in termination of this probation period and aggressive action to bring about your separation from the Coast Guard."

(8) On December 14, 1990, in further "Administrative Remarks" detailing Spehr's performance shortcomings, Lt. Kochan noted a specific incident on Spehr's last sea patrol.

"While on patrol this period, RD1 Spehr asked to be relieved as XPO because he was unfamiliar with the oparea [operations area]. His justification was that the QMI onboard had more experience in the oparea and therefore, could perform better as the XPO. While a noble gesture, RD1 Spehr totally relieved himself of the responsibility rather than asking the QMI for assistance to gain the experience for himself."

In a handwritten note at the end of the "Administrative Remarks" Spehr wrote that "I strongly disagree. I asked to be relieved due to QMI OJA's experience was more than mine. QMCS [James] Parks agreed at the time. QMCS Parks also tried to murder me underway."

(9) On December 29, 1990, Spehr was admitted to the USAF Medical Center at Keesler Air Force Base in Key West for a "full neuropsychiatric evaluation" of "possible paranoid behavior." In a report dated January 16, 1991, a staff psychiatrist, Captain Sharon LaRose, diagnosed Spehr as having a personality disorder "with significant impairment in occupational functioning." The diagnosis was based on clinical observation of Spehr in the preceding two and a half weeks, which included psychiatric testing (the Minnesota Multi-phasic Personality Inventory, or MMPI, test), and input on Spehr's work and performance provided by his CO. Spehr's prognosis "appear[ed] guarded," according to the report, and "in a less rigid environment than the military, he might be able to do quite well." Dr. LaRose closed her report by stating that a letter would be sent to Spehr's commanding officer recommending his separation from the Coast Guard "on the

basis of a personality disorder." Dr. LaRose wrote to Lt. Kochan the same day, advising that "if [Spehr] continues in the service, he will probably require disciplinary action, medical care, or both. I further doubt that transfer or change of duty would increase his effectiveness or solve his difficulties..... It is my opinion that [Spehr] meets the criteria for administrative separation."

(10) Consistent with Dr. LaRose's observations Lt. Kochan informed Spehr by letter dated February 13, 1991, that he "intend[ed] to initiate action to discharge you from the U.S. Coast Guard .... for unsuitability due to a personality disorder."

The Commander of the Coast Guard Group Key West, Robert Scobie, then ordered the administrative discharge board to be constituted, which held its hearing on June 3–4, 1991, and produced its report on August 2, 1991. The board's final "Opinions" were as follows:

(1) Spehr had a personality disorder in evidence since 1984.

(2) Spehr had some type of personal/performance problem at each Coast Guard unit to which he had been assigned.

(3) These problems resulted in part from Spehr's inability to cope with work-related stresses.

(4) Spehr manifested his stress-related frustration with inappropriate behavior such as explosive anger, trading threats with coworkers, domestic strife, and inappropriate reaction to comments or criticism by supervisors and coworkers.

(5) Spehr's personality disorder affected his ability to get along with others and to perform satisfactorily in a military environment.

(6) The personality disorder is not Spehr's fault and in a different environment he could be expected to perform well.

The board's final "Recommendation" was that Spehr be discharged from the Coast Guard for "Unsuitability under Art. 12–B–16(b)(2) of the CG Personnel Manual, COMDTINST M1000.6A. Personality Disor-

ders," and that he be awarded an honorable discharge. Cmdr. Scobie forwarded this recommendation to the interim reviewing authority (the Commander of the Seventh Coast Guard District), who in turn forwarded the record with the recommendation that Spehr be discharged to the final reviewing authority (the Commander of the Coast Guard Maintenance & Logistics Command, Atlantic).

Spehr's counsel in the administrative discharge proceeding, Lt. Rosanne Trabocchi, sent three "letters in rebuttal" to the final reviewing authority between September and December 1991 in which she complained about alleged procedural and substantive errors by the administrative review board. In her second letter, dated November 25, 1991, Lt. Trabocchi asserted that Spehr "was not afforded a fair and impartial hearing." According to Trabocchi. "[t]he preponderance of evidence shows that RD1 Spehr may suffer from an adjustment disorder as opposed to a personality disorder. An adjustment disorder is not the basis for discharge." Lt. Trabocchi appealed to the Final Reviewing Authority to "disregard the [administrative review board's] action, and find [its] recommendation invalid."

On April 7, 1992, notwithstanding Lt. Trabocchi's letters of rebuttal, the final reviewing authority directed that Spehr be honorably discharged from the Coast Guard by reason of his unsuitability due to a personality disorder.[2] This action was in accordance with the recommendation of the Chiefs of the Personnel Services Division and the Office of Personnel and Training in a nine-page report which reviewed the proceeding before the administrative discharge board and concluded that its "findings of fact, opinions, and recommendations are legal and have an adequate basis in the record." In that report several of the issues raised by Lt. Trabocchi in her letters of rebuttal were specifically addressed. The report referred to Spehr's "numerous allegations" of "improprieties" by the board. It stated that these allegations had been reviewed by the Chief Counsel, who

2. While his case was still being considered by the final reviewing authority, Spehr's term of enlistment had been extended on November 29, 1991 for a period of six months—i.e., until May 29, 1992.

had "found no legal infirmities which would invalidate the [board's] results."

By way of example, Spehr's counsel asserted that one of the board's members, Chief Warrant Officer (CWO) Kabick, expressed the view that although the board did not want to recommend discharge, they felt "their hands were tied" and that they had "to go with the doctor." Counsel also alleged that Kabick made another statement that "Ron Kochan [Spehr's commanding officer] is a good friend of mine, a personal friend." These statements, according to Lt. Trabocchi, indicate that Spehr was denied an impartial hearing. The Chief Counsel expressed the view that the fairness of the hearing was not impaired by CWO Kabick's remarks— that Lt. Trabocchi "probably misunderstood the import of the Board member's remarks." In the Chief Counsel's opinion, "[Kabick] may have intended his remarks to mean simply that the Board did not wish to see respondent discharged in light of his length of service, but that the Air Force psychiatrist's diagnosis had compelling weight leaving the Board with no real choice in the matter when considering the best interests of the Coast Guard."

As another example, the report discussed Lt. Trabocchi's assertion that the diagnosis of the Air Force psychiatrist who observed Spehr at Keesler AFB was incorrect, based on her inexperience, and that it contradicts three other opinions by more experienced military and civilian doctors. Trabocchi also alleged that Dr. LaRose's diagnosis was tainted by a prior conversation with Spehr's commanding officer (Lt.Kochan). In the Chief Counsel's opinion, however, the evidence of record, including Spehr's problems in the Coast Guard dating back to 1984, the results of the MMPI psychological test, and the weeks of sustained observation at Keesler AFB, supported LaRose's diagnosis that Spehr had a personality disorder. "While RD1 Spehr's performance since being assigned to Group Key West has been good," the report noted, "it has been in purely administrative assignments with little of the pressure of an operational billet. The record

shows by a preponderance of the evidence that RD1 Spehr suffers from a personality disorder, notwithstanding the existence of some testimony favorable to him."

One further example of alleged procedural irregularities related to the recorder's erroneous reference to himself during the administrative discharge hearing as the Government Counsel. According to Spehr's counsel, that comment may have led the board members to rely on his statements as legal advice or legal opinions. In the view of the Chief Counsel, however, there was "no indication in the record that the Board was led to its conclusions with respect to RD1 Spehr because of a misunderstanding of the recorder's role in the proceedings."

On May 8, 1992, in accordance with the final reviewing authority's action on April 7, 1992, the Coast Guard issued Spehr a "Certificate of Release or Discharge from Active Duty" on the standard military form DD–214. This document listed the reason for separation as "unsuitability" and the "reentry code" for Spehr as RE–4 (not eligible for reenlistment). The record includes a copy of Spehr's "Honorable Discharge," certifying that he was discharged from the Coast Guard on May 8, 1992. This date was three weeks prior to the scheduled expiration of his six-month extension on May 29, 1992.

On October 25, 1993, Spehr petitioned the Department of Transportation's Board for Correction of Military Records (BCMR), under 10 U.S.C. § 1552, to reverse the finding of the administrative discharge board.[3] On April 25, 1994, the BCMR received an advisory opinion from the Coast Guard recommending that Spehr's petition be denied. The advisory opinion was sent to Spehr, who submitted a rebuttal to the BCMR on May 16, 1994, asking for the removal of his RE–4 reentry code (to allow for reenlistment in the Coast Guard) and for financial compensation of some $1.8 million, among other things for the time he "suffered for incarceration in a mental health ward." The package of compensation claims included $500,000 for defamation of character, $300,000 for harassment by co-workers, and $375,000 for seven years

---

**3.** The United States Coast Guard, though a military service and a branch of the nation's armed forces, operates as an element of the Department of Transportation. 14 U.S.C. § 1.

of lost pay potential. In his rebuttal Spehr alleged that he suffered a series of psychological and physical abuses in the Coast Guard, including demeaning jobs (like picking up cigarette butts and cleaning toilets), threats and physical assaults (like having a knife pulled on him and "verbal threats to blow out my brains"), and that his 5th amendment right to due process had been violated by the "Coast Guard Chief Counsel's report." In a subsequent submission to the BCMR Spehr amplified his charges of harassment and mistreatment in the Coast Guard, asserting that "my treatment .... ran the gamut of inappropriate actions until finally a member of the unit attacked me, hitting me in the face and knocking my glasses to the deck." His assailant, according to Spehr, "then lifted me with a half-nelson, dragging me backwards while choking me without relief." [This incident was presumably the altercation with QMCS James Parks during Spehr's last sea patrol.]

In its Final Decision, issued on October 21, 1994, the BCMR denied Spehr's petition for correction of his military record in its entirety. BCMR No. 12–94. The BCMR recounted the factual and procedural background of the case, and quoted from an additional response by Spehr charging that his Coast Guard career was terminated as punishment for reporting the alleged physical attack on his person (by QMCS Parks). The Board concluded that Spehr had "failed to introduce sufficient evidence to show that the Coast Guard administrative discharge board committed error or injustice in .... discharging [Spehr] by reason of unsuitability due to personality disorder."

### LITIGATION HISTORY

On August 12, 1997, Spehr filed a complaint (*pro se* ) against the U.S. Coast Guard in the U.S. District Court for the Middle District of Florida (Case No. 97–1971–CIV–T–23B) alleging that he was wrongfully discharged in violation of his Constitutional (5th amendment) right to due process and other federal law. Spehr sought various relief, including "restitution for lost wages, canceled benefits, and a full retirement." On March 13, 1998, defendant filed a motion to dismiss

the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted in accordance with Fed.R.Civ.P. 12(b)(1) and 12(b)(4). One of the grounds cited by defendant was that plaintiff's suit stated a claim for monetary relief against the United States in excess of $10,000, which put it beyond the dollar threshold for federal district court jurisdiction set by the "Little Tucker Act," 28 U.S.C. § 1346(a)(2). That statute grants concurrent jurisdiction to U.S. district courts and the Court of Federal Claims for any "civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.* In subsequent pleadings defendant acknowledged that Spehr's complaint, since it claimed damages against the United States of over $10,000, would more properly have been brought in the Court of Federal Claims (under the Tucker Act, 28 U.S.C. § 1491). The District Court thereafter ordered the case transferred to the Court of Federal Claims on February 26, 1999. The District Court record was filed with this court on May 26, 1999.

On June 22, 1999, Spehr filed an amended complaint (still *pro se* ) in the Court of Federal Claims. Spehr alleged therein that he was wrongfully discharged because (a) the Coast Guard did not provide him a full and fair hearing due to a host of procedural improprieties in violation of federal law and military regulations, (b) the BCMR failed to consider evidence that any personality disorder Spehr suffered was the result not of a pre-existing condition, but of a harassing work environment, and (c) the Coast Guard failed to provide Spehr fair and equal treatment in violation of his rights under the 5th and 14th amendments and various federal laws. Plaintiff set forth, in essence, the following claims for relief:

— back pay from May 8, 1992, taking into account all advancements he would have received in the interim,

- reissuance of his uniform and retroactive consideration for service-related awards,
- retirement as an E–9, and the active assistance of the Coast Guard in securing him "an available civilian position" in South Florida,
- voiding of his administrative discharge as illegal and based upon "fraud," and removal of his RE–4 reentry code classification (barring reenlistment),
- complete neurological testing by a VA hospital, and
- an award of $1,800,000 for denial of "due process" in violation of the 5th and 14th amendments, consisting of (1) between $175,000 and $250,000 for lost income potential (unless defendant agrees to compensate plaintiff for all back pay, advancements and allowances he would have received in the intervening years), as well as a housing allowance and reimbursement for all medical insurance premiums since 1992, (2) $600,000 in compensation for unlawful harassment and discriminatory treatment under various federal statutes, (3) between $790,000 and $865,000 for additional "special damages," and (4) $15,000 for attorney fees (though plaintiff at the time was *pro se* ).

The Government filed a "partial motion to dismiss" on October 19, 1999. In essence, defendant argued that this court lacks subject matter jurisdiction over all claims asserted by plaintiff except the claim for back pay and allowances stemming from his allegedly unlawful discharge from the Coast Guard. Defendant acknowledged that the Tucker Act, 28 U.S.C. § 1491(a)(1), would provide a jurisdictional basis for that claim, and that plaintiff could invoke a substantive right to recover money damages from the Government under the Military Pay Act, 37 U.S.C. § 204. Even then, the Government asserted, the court must confine its judicial review to the administrative record of the BCMR proceeding and overturn that decision only if the Board's findings were arbitrary, capricious, contrary to law, or unsupported by the evidence.

Plaintiff then retained legal counsel, who filed a motion for "summary partial judgment" on February 3, 2000. In that motion

plaintiff asserted that the Coast Guard is liable to Spehr for military pay and allowances from May 8, 1992 to the present because the discharge certificate issued on that date was legally deficient and therefore did not effectively discharge Spehr from the Coast Guard. Specifically, the certificate was not accompanied by Spehr's "final pay" within the meaning of 10 U.S.C. § 1168. That statute provides that "[a] member of an armed force may not be discharged or released from active duty until his discharge certificate .... and his final pay or a substantial part of that pay, are ready for delivery to him ...." *Id.* In plaintiff's proposed findings of uncontroverted fact, which were attached to his motion for summary partial judgment, plaintiff asserted that the Coast Guard did not pay him any money for his last eight days of service (May 1–8, 1992), nor any amount for his 18.5 days of accrued leave. Therefore, according to plaintiff, the Coast Guard did not accomplish its intended purpose of discharging Spehr on May 8, 1992 because it did not have "his final pay or a substantial part of that pay .... ready for delivery to him," as required by the statute, 10 U.S.C. § 1168. Thus, plaintiff contends that he is still technically a member of the Coast Guard.

On February 22, 2000, the Government filed a motion to strike plaintiff's proposed findings of uncontroverted fact, arguing that they were immaterial to the pending action and form the basis of a new and independent claim for relief. The Government argued that the amended complaint before the court presents claims relating to plaintiff's alleged wrongful discharge from the Coast Guard, whereas the proposed findings of fact relate to an entirely different claim and legal theory—*i.e.,* that Spehr never received his "final pay" and therefore was never officially discharged from the Coast Guard. The administrative record does not deal with the new claim, the Government contended, and Spehr did not seek leave of the court to amend his complaint, pursuant to RCFC 15(a), to include the claim. Nor should plaintiff be allowed to amend his complaint for this purpose, the Government continued, because the new "ineffective discharge" claim did not re-

late back to the original complaint, as required by RCFC 15(c).

In defendant's opposition to plaintiff's motion for "partial summary judgment" (sic), filed on March 3, 2000, the Government repeated its arguments that the "ineffective discharge" claim was not properly before the court. In addition, defendant argued that the claim was time-barred by the six-year statute of limitations provided in the Tucker Act, 28 U.S.C. § 2501. The alleged claim arose in May 1992, but it was not asserted in this court until February 2000, nearly eight years later. Moreover, the Government contended that plaintiff failed to exhaust his administrative remedies because he never requested the BCMR to review the validity of his discharge. Accordingly, the "ineffective discharge" claim was not addressed in the BCMR decision and is not part of the administrative record on which this court's judicial review is based.

On March 7 and March 22, 2000, plaintiff filed responses to defendant's motion to strike and defendant's opposition to plaintiff's motion for summary partial judgment, contending that the "ineffective discharge claim" was not new, but rather part and parcel of the two central issues in this action: (1) What is Spehr's status with the Coast Guard—i.e., was he properly discharged or is he still technically on active duty by reason of improper procedures in attempting to discharge him? (2) What amount of money (if any) is due the plaintiff because of his prior or current status with the Coast Guard? Plaintiff argued that his pleadings all relate to an alleged wrongful discharge and that the Government was put on notice in the pleadings that the plaintiff's claim was based on "procedural anomalies." Plaintiff requested that he be allowed to amend his complaint, if the court deems it necessary, to include an "ineffective discharge" claim. Plaintiff also charged that the Government failed to file a statement of genuine issues, as required under RCFC 56(d)(2), to accompany its opposition to plaintiff's motion for summary judgment.

By order dated November 28, 2000, the court directed counsel for defendant to furnish the court with the administrative record relating to plaintiff's discharge from the Coast Guard, as well as the Coast Guard records pertaining to Spehr's final pay. On December 26, 2000, plaintiff filed a motion requesting that the court order the Government to respond to a claim that the Coast Guard failed to pay Spehr $1,030.95 allegedly owed as reimbursement for travel and relocation expenses in 1988. In an order dated January 9, 2001, the court noted that this claim for reimbursement was not part of the original complaint filed by plaintiff in U.S. District Court, nor the amended complaint filed in this court. Nevertheless, in the interest of resolving all pay issues related to plaintiff's service with the Coast Guard, the court ordered the Government to furnish the court with all available documentation related to the reimbursement claim. In fulfillment of the court's orders of November 28, 2000, and January 9, 2001 (as well as two subsequent orders on March 29 and April 6, 2001, requesting the submission of some other materials), defendant filed five volumes of documentation totalling over 1,600 pages between December 15, 2000, and August 7, 2001.

On May 2, 2001, plaintiff filed a "second motion for summary partial judgment," together with a motion for expedited briefing, on the narrow issue of whether the composition of plaintiff's administrative discharge board violated applicable regulations, thus rendering its proceeding and decision with respect to Kurt Spehr a legal nullity. By order dated May 4, 2001, the court denied plaintiff's motion for expedited briefing on the issue of the composition of the administrative discharge board and set a briefing schedule in accordance with Rule 56.1 of the Court of Federal Claims (Review of Decision on the Basis of Administrative Record). Plaintiff was directed to address all claims previously raised in a single motion for summary judgment. Plaintiff thereupon filed a "third motion for summary partial judgment" together with proposed findings of uncontroverted fact (amended), on June 1, 2001.

On August 3, 2001, defendant filed an opposition to plaintiff's (third) summary judgment motion, a partial motion to dismiss, and a cross motion for judgment upon the administrative record, together with a counter-

statement of facts and statement of additional facts, in accordance with RCFC 56.1(b)(2). On October 4, 2001, plaintiff filed a "reply brief in support of third motion for summary judgment," together with a response to defendant's statement of additional facts and a statement of genuine issues. In his reply brief Spehr introduced yet another claim— *i.e.*, that he had been diagnosed with a cancerous skin condition in April 1992, the month before his administrative discharge, which constituted a major physical disability under 10 U.S.C. § 1201 entitling Spehr to medical treatment and an extension of his Coast Guard service under 14 U.S.C. § 366. Defendant filed a reply on October 30, 2001.

In accordance with plaintiff's motion for judgment on the briefs, filed on November 1, 2001, and defendant's response that it did not object thereto, no oral argument was scheduled. This ruling, therefore, is based on the written record.

### DISCUSSION

#### I.

The principal jurisdictional statute of this court is the Tucker Act, 28 U.S.C. § 1491, which states that "the United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act is only a jurisdictional statute, *i.e.*, a waiver of sovereign immunity which does not, by itself, confer any substantive right of recovery against the United States. See *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). In order to be compensable in this court, a claim must be based on a provision of law outside the Tucker Act. Moreover, "it is not every claim involving or invoking the Constitution, a federal statute, or a regulation [or a contract] which is cognizable here. The claim must, of

course, be for money." *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967). Thus, an action in this court based on Tucker Act jurisdiction must invoke a provision of law—whether a Constitutional clause, a statute, a regulation, or a contract—conferring a substantive right to recover money damages from the United States. See *Testan*, 424 U.S. at 398, 96 S.Ct. 948; *Ramirez v. United States*, 36 Fed.Cl. 467, 472 (1996).

In the case at bar, plaintiff did not plead jurisdiction based on the Tucker Act. "Federal courts, however, even if not moved by either party, must, *sua sponte*, determine whether they properly have subject matter jurisdiction over the cases that come before them for decision." *Miller v. United States*, 29 Fed.Cl. 107, 111–112 (1993). It is well established that claims for back pay stemming from allegedly unlawful separation from active duty in the armed services are within the jurisdiction of the Court of Federal Claims under 28 U.S.C. § 1491(a). See *Wyatt v. United States*, 23 Cl.Ct. 314, 318 (1991); *Sargisson v. United States*, 913 F.2d 918, 920 (Fed.Cir.1990). It is also well established that the Military Pay Act, 37 U.S.C. § 204 (1994), which sets pay levels for armed forces personnel, is a money-mandating statute that confers upon members of the armed services involuntarily separated prior to the end of their enlistment terms a substantive right to seek recovery of money damages from the United States.[4] See *Sherwin v. United States*, 42 Fed.Cl. 672, 675 (1999). Plaintiff's claim for reinstatement and back pay, therefore, is properly before the court. The likelihood of plaintiff's success on the merits is irrelevant to that determination. This court and its predecessor, the Court of Claims, have long held that "a claimant who says he is entitled to money from the United States because a statute or a regulation grants him that right, in terms or by implication, can properly come to the Court of Claims, at least if his claim is not frivolous, but arguable." *Eastport Steamship Corpo-*

---

4. The Military Pay Act provides, *inter alia*, that "[t]he following persons are entitled to the basic pay of the pay grade [applicable to them], in accordance with their years of service ....—a member of a uniformed service who is on active duty." 37 U.S.C. § 204(a)(1).

*ration,* 372 F.2d at 1008; *Miller,* 29 Fed.Cl. at 112.

■ That being said, plaintiff's potential recovery is limited by the legal caveat that "an enlisted serviceman who has been improperly discharged is entitled to recover pay and allowances only to the date on which his term of enlistment would otherwise have expired." *Dodson v. United States,* 988 F.2d 1199, 1208 (Fed.Cir.1993). Enlisted members of the armed forces do not have a legal right to remain in the service after their terms of enlistment expire. As the Federal Circuit stated in *Dodson,* "no one has a right to enlist or reenlist in the armed forces, unless specially given one by statute or regulation." *Id.* at 1203–04. Kurt's Spehr's term of enlistment, extended by six months on November 29, 1991, was due to expire on May 29, 1992. To stay in the Coast Guard after that date Spehr had to be offered another extension, which was entirely within the discretion of the Coast Guard. That discretion was duly exercised by the Coast Guard, which chose not to reenlist Spehr. Therefore, even if plaintiff can prove he was wrongfully discharged, he would be entitled at most to back pay and allowances up to the last day of his term of enlistment, May 29, 1992.

■ Plaintiff's potential recovery is also subject to another legal caveat—that enlisted members of the armed services do not have an unfettered right to serve until the end of their enlistment terms. Rather, every branch of the armed services has the statutory discretion to terminate a term of enlistment early and involuntarily if it is in the interest of the respective branch to do so and applicable procedures are followed. As provided in 10 U.S.C. § 1169, "[n]o regular enlisted member of an armed force may be discharged before his term of service expires, *except* (1) as prescribed by the Secretary concerned .... or (3) as otherwise provided by law." (Emphasis added.) This court (and the Court of Claims before it) "has long held that where no statute or regulation has been violated, enlisted personnel in the military service do not have a right to remain in the service until the expiration of their term of enlistment." *Brigante v. United States,* 35

Fed.Cl. 526, 529 (1996); see also *Keef v. United States,* 185 Ct.Cl. 454, 463–64, 1968 WL 9154 (1968). "[T]he decision as to whether someone is fit for military service is one properly committed to those executive branch personnel charged with the responsibility of insuring a fit and ready armed force." *Rice v. United States,* 31 Fed.Cl. 156, 166 (1994). Thus, Kurt Spehr cannot claim a vested statutory right to complete (and be paid for) the last three weeks of his extended term of enlistment—*i.e.,* from May 8, 1992, the date of his involuntary discharge, to May 29, 1992, the scheduled termination date of his enlistment term.

As previously noted, plaintiff argues that he is actually entitled to back pay and allowances up to the present day because the Coast Guard failed to follow its own administrative discharge procedures and therefore never effectively separated him from the service on May 8, 1992. This alternative theory, initially presented in plaintiff's first motion for summary partial judgment and later amplified in plaintiff's third motion for summary partial judgment, rests on the proposition that the Coast Guard did not have Kurt Spehr's discharge certificate and final pay, or a substantial portion thereof, "ready for delivery to him" on his scheduled date of discharge, as required under 10 U.S.C. § 1168 to discharge a serviceman from active duty. Defendant contends that plaintiff's "ineffective discharge" argument constitutes a new claim that is not properly before the court because (1) the claim was not asserted before the BCMR and does not relate back to the original complaint(s) in federal district court or this court, (2) the complaint in this court was never amended to include this claim, and (3) the claim is now time-barred by the six-year statute of limitations in the Tucker Act. In response to defendant's "new claim" charge, plaintiff maintains that his pleadings all relate to an "alleged wrongful discharge" and "procedural anomalies concerning" that discharge, and that his motion for summary partial judgment is consistent with the original complaint in discussing claims "relat[ing] to the discharge processing scheduled for Plaintiff on May 8, 1992."

Plaintiff requests permission to amend his pleadings if the court deems such action necessary. RCFC 15(a) provides that "a party may amend the party's own pleading only by leave of the court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The adverse party in this case has not consented to the amendment of Kurt Spehr's pleadings, indeed has argued strongly against allowing plaintiff to amend his claim. While cognizant of defendant's arguments, the court notes that Mr. Spehr was a *pro se* plaintiff in the early years of this litigation in federal district court and in this court. Only when he secured legal counsel was the new theory of "ineffective discharge" presented to the court, supplementing the original claim of "wrongful discharge." In the interest of granting plaintiff the fullest justice possible, the court exercises its discretion under RCFC 15(a) by allowing the amendment of plaintiff's pleadings to assert a claim for "ineffective discharge" from the Coast Guard.

RCFC 15(c) provides that "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." As explained by the Court of Claims in *Snoqualmie Tribe of Indians v. United States*, 178 Ct.Cl. 570, 372 F.2d 951, 960 (1967), "[T]he inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading." With respect to the case at bar, the court finds that Kurt Spehr's "ineffective discharge" claim is a logical product of the general fact situation set forth in his original pleading—namely, the facts and circumstances related to his involuntary separation from the Coast Guard. As such, the "ineffective discharge" claim satisfies the criteria of RCFC 15(c)—*i.e.*, it is a claim that arises "out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading"—and therefore relates back to the date of that pleading. It also satisfies the Tucker Act's six-year limitation period, since the claim relates back to 1997, when Kurt Spehr filed his original pleading in federal district court, just five years after the termination of his Coast Guard career which gave rise to the claim in 1992. Accordingly, plaintiff's "ineffective discharge" claim meets the jurisdictional requirement for consideration by this court. (Defendant's motion to strike plaintiff's original proposed findings of uncontroverted fact, which relate to the "ineffective discharge" claim, is denied.)

## II.

Judicial review of a claim brought pursuant to the Tucker Act, in the context of a military discharge, is confined to the administrative record. *Long v. United States*, 12 Cl.Ct. 174, 177 (1987). When a branch of the armed forces has made a determination that a member is not fit for continued service, that decision is entitled to great deference. *Giglio v. United States*, 17 Cl.Ct. 160, 166 (1989). Plaintiff must overcome the strong, though rebuttable, presumption that military officials, like other public servants, discharge their duties in good faith and lawfully. *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979). The applicable standard of judicial review for a decision by a Board for Correction of Military Records is whether the Board's action was arbitrary, capricious, in bad faith, unsupported by substantial evidence or contrary to law, regulation or published procedure. *Wyatt, supra*, 23 Cl.Ct. at 318–319. To obtain relief upon a claim of unlawful discharge the plaintiff must establish by "cogent and clearly convincing evidence (1) a material legal error or injustice in the [BCMR] proceeding and (2) an adequate nexus between the error or injustice and his separation from service." *Renicker v. United States*, 17 Cl.Ct. 611, 614 (1989).

Motions for judgment on the administrative record are reviewed under the same standards as motions for summary judgment. RCFC 56.1(a); see *Richey v. United States*, 44 Fed.Cl. 577, 581 (1999). Such motions are appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). It goes without saying that when the parties cross move for summary judgment, as in the case at bar, each party bears its own burden of demonstrating the lack of genuine issues of material fact.

In his (third) motion for summary partial judgment, filed June 1, 2001, plaintiff alleged that the Coast Guard committed numerous procedural errors in the administrative discharge process which render both the decision of the administrative discharge board and the subsequent termination of Spehr's Coast Guard service legal nullities. Defendant argues that Spehr failed to introduce convincing evidence to the BCMR that the administrative discharge board committed error or injustice in its 1991 proceeding, which is why its findings were upheld by the BCMR in 1994, and that Spehr has likewise failed in the instant litigation to articulate a cogent and compelling argument why the rulings of the administrative discharge board and the BCMR should be disturbed. Defendant also denies that the Coast Guard committed any errors in the process of separating Spehr from the service that would call into question whether, as a matter of law, he was effectively discharged. The court agrees with defendant that plaintiff has failed to carry his burden of proof that there was any material legal error in the administrative discharge proceedings.

### A.

With respect to the claim that Kurt Spehr was wrongfully discharged from the Coast Guard, plaintiff's allegations, defendant's responses thereto, and the court's determinations, are as follows:

■ (1) Plaintiff argues that Spehr's administrative discharge board was improperly composed of one commissioned officer and two chief warrant officers (CWOs), in violation of internal Coast Guard regulations requiring that "administrative discharge boards shall consist of a minimum of three experienced commissioned officers." Art. 6–L–3, U.S. Coast Guard Administrative Investigation Manual (COMDTINST M5830.1) dated November 6, 1987. According to the plaintiff the two CWOs do not qualify as "experienced *commissioned* officers." Plaintiff cites two

provisions in the U.S.Code, authorizing the appointment of permanent and temporary commissioned officers in the Coast Guard, as distinguishing between commissioned officers and CWOs. The code provisions are 14 U.S.C. § 211 ("The President may appoint .... permanent commissioned officers in the Regular Coast Guard in grades of ensign or above .... from among the following categories .... (2) commissioned warrant officers ....") and 14 U.S.C. § 214 ("The President may appoint temporary commissioned officers in the Regular Coast Guard in a grade, not above lieutenant .... from among the commissioned warrant officers ...."). Plaintiff contends that these statutory provisions make clear the distinction between commissioned officers and lower-standing CWOs, and prohibit the Coast Guard from "substituting" the latter for the former in an administrative discharge proceeding.

The court does not agree with plaintiff's argument. Though the above cited code provisions do make certain distinctions among different ranks of Coast Guard personnel, the code does not define "commissioned officers" in any way that excludes CWOs. Indeed, 14 U.S.C. § 215(b) refers to CWOs as "commissioned officers in the Coast Guard." This provision minors an earlier code provision, 14 U.S.C. § 212(c), in force at the time of plaintiff's administrative discharge proceeding in 1991 but repealed in 1994, which likewise referred to CWOs as "commissioned officers in the Coast Guard." Moreover, the Coast Guard Personnel Manual, Chapter 1.D., specifically defines CWOs as commissioned officers. The definition reads as follows:

> "Chief Warrant Officers (CWOs) are commissioned officers of the Coast Guard .... CWO's are mature individuals with appropriate education and/or specialty experience who have shown through demonstrated initiative and past performance they have the potential to assume positions of greater responsibility requiring broader conceptual, management and leadership skills."

While there are certainly some distinctions between CWOs and other higher-ranking commissioned officers (such as their pay rates and levels of responsibility), the statu-

tory language does not support plaintiff's contention that CWOs are ineligible to sit on administrative discharge boards. Nothing in the statutory provisions can fairly be interpreted as denying the Coast Guard discretion to define for itself what categories of commissioned officers are qualified to sit on its administrative discharge boards. The Coast Guard has decided that CWOs are a category of commissioned officers qualified to sit on administrative discharge boards, and that decision is entitled to deference from this court. See *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–845, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). Moreover, the court is satisfied by the very definition of CWO in the Coast Guard Personnel Manual that the two CWOs who sat on Kurt Spehr's administrative discharge board qualify as "experienced" within the meaning of Art. 6–L–3 of the Administrative Investigations Manual, *supra.*

▉ (2) Plaintiff argues that he did not receive the required medical board proceeding prior to his administrative discharge. For authority plaintiff refers to Arts. 12.-B.16.h and 12.B.16.j. of the Coast Guard Personnel Manual, which provide as follows:

"12.B.16.h. Physical Examination

A member under consideration for discharge for unsuitability must have a physical examination performed by a Public Health Service or Armed Forces medical officer....

3. If it appears a mental or physical disability causes the unsuitability, a medical board will be requested."

12.B.16.j. Documentation

In every case of a discharge for unsuitability, the documents listed below are required ...

. . . .

4. Report of medical board or SF–502 as applicable.

As defendant correctly points out, the foregoing provisions establish the opposite of what plaintiff argues—*i.e.,* that Spehr was *not* entitled to a medical board proceeding in his case. When the Coast Guard considers discharging a member for unsuitability, the

Personnel Manual states that a physical examination by a medical person is required. Only if the unsuitability is caused by a *mental or physical disability* is a medical board proceeding also in order. Under Coast Guard regulations, however, a "personality disorder" does not qualify as a mental or physical disability. In its "Physical Disability Evaluation System," which defines "mental disability" as a subspecies of physical disability, the Coast Guard defines "physical disability" as:

"Any manifest or latent physical impairment or impairments due to disease, injury, or aggravation by service of an existing condition .... that .... make a member unfit for continued duty. *The term 'physical disability' includes mental disease, but not* such inherent defects as behavior disorder, *personality disorders,* and primary mental deficiency."

USCG Directive System, Commandant Instruction Manuals, 1850.2C—Physical Disability Evaluation System, Art. 2.A.38. Physical Disability (emphasis added). Thus, when the Coast Guard was considering discharging Kurt Spehr for unsuitability due to a personality disorder, he was entitled to a physical examination in accordance with Art. 12.-B.16.h. of the Personnel Manual. Spehr was duly examined by Captain Sharon LaRose, an Air Force psychiatrist, who documented her evaluation of a personality disorder in an SF–502 report, as required by Art. 12.B.16.-j.4. No report from a medical board was required since Spehr was not diagnosed as having a mental or physical disability as defined in Coast Guard regulations.

▉ As previously mentioned, plaintiff has also belatedly claimed that he was entitled to a medical board review because of a cancerous skin condition (basal cell carcinoma on his neck) which qualified as a physical disability (entitling him to retirement pay) under 10 U.S.C. § 1201. Kurt Spehr did not raise the issue of his basal cell carcinoma, much less assert that it should be considered a disabling physical condition, at any time during the earlier administrative proceedings. A claimant's failure to raise an issue during BCMR proceedings constitutes a waiver of the issue in this court. *Walden v.*

*United States*, 22 Cl.Ct. 532, 538 (1991); *Doyle v. United States*, 220 Ct.Cl. 285, 599 F.2d 984, 1000 (1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980). Accordingly, Kurt Spehr is precluded from arguing for the first time before this court that his basal cell carcinoma was a physical disability entitling him to a medical board review prior to his administrative discharge from the Coast Guard in 1992.

Moreover, even if Spehr could raise the issue in this action, the court finds plaintiff's argument that his basal cell carcinoma entitled him to a medical board review unconvincing. The statute cited by plaintiff, 10 U.S.C. § 1201, authorizes branches of the armed forces to retire service members (with retirement pay) if they are determined to be "unfit to perform the duties of the member's office, grade, rank or rating because of physical disability incurred while [in the service]." *Id.* at § 1201(a). The supporting documentation submitted by plaintiff indicates that Spehr's basal cell carcinoma is a recurrent condition, first diagnosed in 1983, and that he was most recently treated for it in July 2000. Spehr was examined and treated for the same medical condition at least three times during his Coast Guard career—in April 1985, December 1989/January 1990, and in April 1992, the month before his administrative discharge. At no time during those years was there any indication from either Spehr or the Coast Guard that the medical condition might qualify as a "physical disability" rendering Spehr "unfit to perform his duties" within the meaning of 10 U.S.C. § 1201(a). In the 1600–page administrative record there is not one mention of Spehr's medical condition. The logical deduction to draw therefrom is that the medical condition was not serious enough to interfere with Spehr's performance of his Coast Guard duties.

In sum, Spehr's arguments that he was entitled to a medical board proceeding under Art. 12.B.16.h. of the Coast Guard Personnel Manual is meritless.

▉ (3) Plaintiff argues that the administrative discharge proceeding deprived him of a public hearing because his wife, Sally Spehr, was excluded from the proceeding.

He also alleges that contrary to regulations, the administrative record does not reflect the reason for the exclusion of plaintiff's wife or for the departure of Master Chief Benson, who was attending the proceeding, by order of the presiding officer. Spehr asserts that the transcript of the administrative discharge hearing does not include any reason for the exclusion of these persons, and therefore violates Art. 3–D–2 of the Administrative Investigations Manual. Plaintiff's charges are meritless.

The Coast Guard's Administrative Investigations Manual specifically provides that "[w]itnesses other than a party should be excluded from the courtroom except when testifying." COMDTINST M5830.1, Art. 3–H–4. Thus, it was well within the board's discretion, as defendant points out, to exclude a testifying witness like Sally Spehr except while she was giving her testimony. Moreover, Master Chief Benson was requested to leave the room by Spehr's *own counsel* (Lt. Trabocchi) because she felt the next witness, a service colleague of Spehr's, "would not testify in front of anybody from group or the command." Transcript at 134–35. Benson acceded to Lt. Trabocchi's request, stating "I will voluntarily leave if that will solve the problem." *Id.* at 135. So Benson left the proceeding for *Spehr*'s benefit. Plaintiff's reference to Art. 3–D–2 of the Administrative Investigations Manual ("The proceedings shall be public unless the convening authority or the court, for security reasons or other good cause (which shall be noted in the record), directs that the entire proceedings or any portion be closed to the public.") is frivolous. Aside from the fact that it does not apply to the factual situation in Spehr's case, the record is crystal clear as to the reason for Benson's departure, and that Sally Spehr's exclusion accorded with applicable regulations. Thus, plaintiff's claim that he was denied a public hearing is groundless.

▉ (4) Plaintiff argues that evidence was used against him in violation of his rights against self-incrimination. In particular, plaintiff alleges that while under psychiatric observation at Keesler AFB in the winter of 1990–91 "tainted and inadmissible evidence" was involuntarily taken from him,

without which there would not have been sufficient evidence for the administrative discharge board to conclude that Spehr had the type of disorder that justified his discharge from the Coast Guard. The violations alleged by Spehr include being (a) coerced into giving information for purposes of the psychiatric or psychological tests and consultation, (b) denied an opportunity to consult with legal counsel, and (c) required to participate in clinical procedures at the base under the threat of long-term commitment to the facility. These actions, according to plaintiff, violated his rights under the 5th Amendment to the Constitution ("No person . . . . shall be compelled in any criminal case to be a witness against himself") and under Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831 ("Compulsory self-incrimination prohibited").

The record does not support plaintiff's allegations. Spehr had a long history of erratic behavior in the Coast Guard. He had received a lot of counseling and psychiatric evaluation in the years before his two and half week stay at Keesler AFB. Given the wealth of evidence from multiple sources concerning Spehr's troubles in the Coast Guard, it is a stretch for plaintiff to assert that there would *not* have been sufficient evidence for the administrative discharge board to make its finding that Spehr had a personality disorder without the staff psychiatrist's diagnosis at Keesler AFB. Moreover, there is no convincing evidence that plaintiff's rights were violated in any way during his time at Keesler AFB. Spehr's complaint about a violation of his 5th Amendment or Art. 31 rights is inapposite. The sole purpose of the Coast Guard's psychiatric evaluation of Kurt Spehr was to determine his suitability for retention in the service. As stated in the Coast Guard's Administrative Investigations Manual, Art. 1–A–4.c.:

> "Coast Guard investigations are administrative and not judicial in nature, and thus are neither designed nor intended to fix civil or criminal liability. They are conducted, if at all, to alert Coast Guard officials to any need for or desirability of, particular management decisions or actions."

An individual can invoke the privilege against self-incrimination in an investigatory proceeding only if he or she reasonably believes that the information is being sought for use in a subsequent state or federal criminal proceeding. *Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Kurt Spehr could not have had any such reasonable belief during his investigation at Keesler AFB. He knew quite well that the psychiatric evaluation aimed solely at determining his fitness for continued Coast Guard service, and not for any criminal or court martial proceeding. Accordingly, Spehr was not entitled to any 5th Amendment or Article 31 warning about self-incrimination.

██ (5) Plaintiff alleges that his due process rights were violated through "command influence" exerted upon the administrative discharge proceeding. Plaintiff cites remarks of one of the board's members, CWO Kabick, as evidencing the influence being brought to bear by Kurt Spehr's commanding officer, Lt. Kochan, thereby undermining the board's fairness and impartiality. The remarks were allegedly made to James Rockefeller, a petty officer serving with Spehr in Florida, whose deposition was taken in September 1998 while this case was still in the U.S. District Court for the Middle District of Florida. According to Rockefeller, Kabick told him in passing during the two-day administrative discharge hearing that "it is open and shut. Kurt is gone. The old man wants him out, so Kurt is gone." Plaintiff explains that the "old man" referred to by Kabick was Spehr's commanding officer, Robert Scobie, as clarified on page 10 of the deposition transcript. (Robert Scobie, as previously noted, was the Commander of the Coast Guard Group Key West.)

As a threshold matter, the court notes that plaintiff did not raise the subject of any alleged conversation between CWO Kabick and Petty Officer Rockefeller either during or after the administrative discharge hearing in June 1991. The issue was not discussed by plaintiff's counsel, Lt. Trabocchi, in any of her three letters of rebuttal to the final reviewing authority in the fall of 1991. Nor did Spehr raise the issue in his subsequent

petition to the Board for Correction of Military Records in the October 1993 to reverse the findings of the administrative discharge board. As previously discussed, a claimant's failure to raise an issue during BCMR proceedings constitutes a waiver of the issue in this court. *Walden, supra,* 22 Cl.Ct. at 538; *Doyle, supra,* 599 F.2d at 1000. Accordingly, Kurt Spehr is precluded from arguing for the first time before this court that the Rockefeller–Kabick conversation in June 1991 is evidence that "command influence" was brought to bear in the administrative discharge hearing.

Moreover, even if Spehr could raise the issue in this action, the court finds plaintiff's argument of "command influence" unconvincing. The language quoted from Rockefeller's affidavit, even if true, could be interpreted in various ways. Kabick's comments about Cmdr. Scobie may simply have reflected a general exasperation with Kurt Spehr's behavior over the years at Coast Guard Group Key West. Kabick may also have been revealing his own opinion about Spehr's suitability for continued service, based on the testimony he had heard thus far, and using the reference to Scobie to veil the fact from Rockefeller that it was his own opinion of Spehr. Confronted with an allegation such as plaintiff's, the court presumes "that the administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders, supra,* 594 F.2d at 813 (Ct.Cl.1979). Aside from the uncorroborated Rockefeller affidavit, taken more than seven years after Spehr's administrative discharge hearing, there is no other evidence in the record that Cmdr. Scobie or anyone else in the chain of command exercised any improper influence on the administrative discharge board. Indeed, the record demonstrates in voluminous detail the extent to which Spehr's superior officers tried to help him over the years, such as referring him for counseling and psychiatric evaluation and giving him repeated chances to improve his job performance and establish his suitability for continued service.

■ (6) Plaintiff argues that he was not allowed to complete a six-month probation period prior to the administrative discharge proceeding. Spehr was notified by letter from his commanding officer, Lt. Kochan, dated December 4, 1990, that he was being placed on probation for six months. But the probationary period was only half over, plaintiff complains, when Cmdr. Scobie, acting on Kochan's recommendation, ordered on March 4, 1991, that an administrative discharge board be convened. (The subsequent two-day hearing began on the day—June 3, 1991—that Spehr's six-month probationary period expired.)

As defendant points out, however, the Coast Guard was not required to grant Spehr a full six-month probation before discharging him. In his letter of December 4, 1990, Lt. Kochan informed Spehr that, under Art. 12–B–16 of the Personnel Manual, "an individual believed to be unsuitable due to a personality disorder must be evaluated by a psychiatrist" and "a formal probation period, for a set period of time, [must] be established prior to initiating discharge action." After advising Spehr that he was entering a formal probation period of six months, due to expire June 3, 1991, Kochan wrote: "You are cautioned that I am under no obligation to let the probation period run its full course. Significant failure to show improvement, or repetition of the behavior that led to initiating this probation period, will result in prompt action to separate you from the service." Thus, Spehr was informed that Coast Guard regulations required only that a probation period "*be established* prior to initiating discharge action," not that it necessarily be *completed.* Moreover, Spehr was specifically told by Kochan that an administrative discharge proceeding might begin before the end of the probation period. The court finds that the actions of Lt. Kochan and Cmdr. Scobie in initiating Kurt Spehr's administrative discharge proceeding halfway through the probation were within the scope of their discretionary authority. The court notes, once again, that the administrative discharge hearing did not actually take place until June 3–4, 1991, precisely when the six-month probation expired. So Kurt Spehr did, in fact, have six full months to establish his suitability for continued service in the Coast Guard.

(7) Plaintiff asserts that the transcript of the administrative discharge hearing does not indicate that an oath was administered "to the court reporter." Plaintiff cites Arts. 4–D–6 and 3–G–3 of the Coast Guard Administrative Investigations Manual (COMDTINST M5830.1 dated November 6, 1987) as requiring such an oath.

This argument is frivolous. First of all, nobody was acting in the capacity of a "court reporter" at Kurt Spehr's administrative discharge hearing because it was not a *court* proceeding. Art. 3–G–3 appears in the chapter entitled "Courts of Inquiry" and applies only to *court* reporters (providing that the reporter "make an oath or affirmation" at the commencement of a court proceeding that he or she "will faithfully perform the duties of reporter to this court"), not to reporters in hearings before an administrative board. Thus, Art. 3–G–3 was inapplicable to Kurt Spehr's administrative discharge hearing. Art. 4–D–6, which appears in the chapter entitled "Investigations," provides that "oaths for reporters .... from section 3–G" be administered by the board's recorder. This article did apply at Spehr's hearing. Whether or not the oath was actually administered is unclear from the record. But plaintiff has submitted no evidence that any procedural oversight of this nature, assuming it occurred, affected any material issue relating to the conduct of the administrative discharge hearing or Spehr's subsequent discharge from the Coast Guard. Plaintiff has not alleged that the accuracy of the witness testimony was affected by any failure of the reporter to take an oath. In short, plaintiff's argument is totally lacking in "materiality."

### B.

As for Kurt Spehr's claim that his discharge by the Coast Guard was legally ineffective, plaintiff's allegations, defendant's responses thereto, and the court's determinations, are as follows:

(1) Plaintiff asserts that he was not delivered a discharge certificate (DD Form 214) on his scheduled day of discharge, May 8, 1992. Spehr acknowledges that he signed a DD Form 214 on May 8, 1992, but alleges that he was only permitted to keep a copy with errors on it, which he refused to sign, and did not receive the correct copy with his signature until around June 15, 1992. According to plaintiff, these actions did not accord with the provisions of 10 U.S.C. § 1168 ("Discharge or release from active duty: limitations") and therefore failed to accomplish the Coast Guard's intended purpose of discharging him. 10 U.S.C. § 1168 provides that "[a] member of the armed force may not be discharged or released from active duty until his discharge certificate or certificate of release from active duty, respectively, and his final pay or a substantial part of that pay, are ready for delivery to him ...." Since Spehr's DD Form 214 was not ready for delivery to him on May 8, 1992, plaintiff argues that he was not discharged from active duty on that date. Nor did the Coast Guard achieve this objective by mailing the discharge certificate to Spehr several weeks later, plaintiff argues, because the DD Form 214 is specific to the day on which it issued and several entries on the form would be different if the date of delivery to him were later than the date the form was signed. Plaintiff cites case law stating that a service member remains on active duty if he or she has not been properly discharged from the service. *Garrett v. United States,* 625 F.2d 712, 713 (5th Cir.1980), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981).

 Defendant responds that plaintiff's assertions regarding the timing of his DD Form 214 raise no material issues relating to plaintiff's discharge from the Coast Guard. The court agrees. Kurt Spehr appeared personally before the Coast Guard command on May 8, 1992, to be processed for discharge, and he signed a DD Form 214 on that date. As the statutory language makes clear, and this court has specifically held: "the statute governing discharge from the armed services, 10 U.S.C. § 1168(a) (1982), does not mandate actual *receipt* of discharge documents, but rather that the documents be *ready for delivery* to service members on their separation date." *Hamon v. United States,* 10 Cl.Ct. 681, 683 (1986) (emphasis in

the original).[5] That plaintiff requested certain corrections to the DD Form 214 he was presented on May 8, 1992, and kept an unsigned copy without those corrections until the corrected version was mailed to him by the Coast Guard several weeks later, does not mean that the Coast Guard did not comply with the statutory requirement that Spehr's discharge documents be "ready for delivery" on his date of discharge. The Coast Guard did have the DD Form 214 ready for delivery on Spehr's discharge date, and any inadvertent error(s) in that document that may have necessitated a short delay in mailing him a corrected version do(es) not amount to a material error calling into question the legal effectiveness of the discharge.

▆ (2) Plaintiff alleges that the Coast Guard failed to pay him all of the "final pay" he was due upon discharge from the service. In his separation letter from the Coast Guard, dated May 8, 1992, Spehr was advised that "Your initial separation represents a substantial portion of your final pay and includes partial payment for any unused leave .... Any remaining payment due you will be paid by the Coast Guard .... within 45 days .... The final LES [leave and earnings statement] and final separation payment will be mailed to the address provided [by you]." Plaintiff acknowledges that he received a check for $872.00 as an initial installment of his final pay, as well as a subsequent payment from the Coast Guard in late May or early June 1992 of about $300 or $400. This second installment, plaintiff alleges, fell short of the amount he was owed—$713.94. Plaintiff also charges, in his various pleadings, that the amounts he received from the Coast Guard did not cover, or pay in full, an estimated $447.92 to which he was entitled for his last eight days of service (May 1–8, 1992) or the dollar value—$1,080.59—of his accrued leave (18.5 days). According to plaintiff, therefore, the Coast Guard did not have "his final pay or a substantial part of that pay .... ready for delivery to him," as required to effectuate a discharge under 10 U.S.C. § 1168.

The record does not corroborate plaintiff's allegation that the Coast Guard failed to deliver his "final pay." The record includes Spehr's Leave and Earnings Statements (LES) for May and June 1992, which show the following: As listed in the May statement, Spehr was entitled to earnings of $765.22 (consisting of $467.28 in basic pay and $297.94 in allowances) for his last eight days of service (May 1–8, 1992), plus $1,080.59 in compensation for 18.5 days of unused leave. Those "entitlements" add up to $1,845.81. In addition, the May statement listed "deductions" of $1,131.87, which included $259.87 in taxes and life insurance and a "special payment" of $872.00. The difference between Spehr's entitlements ($1,845.81) and deductions ($1,131.87) in the May statement was $713.94—the amount entered in the "net earnings" box. The amount of $713.94 was also listed in Spehr's June statement (under "deductions") as a "special payment." Defendant has submitted documentary evidence that the U.S. Treasury issued checks to Kurt Spehr of $872.00 and $713.94 (the amounts of the two "special payments") on April 27, 1992, and June 4, 1992, respectively. Thus, the record refutes plaintiff's contention that the second "special payment" he received from the Coast Guard was only $300 or $400, rather the full amount of $713.94.

Moreover, the evidence indicates that the two "special payments" covered all of the "final pay" to which Kurt Spehr was entitled upon his separation. The "special payments" to Spehr on April 27 and June 4, 1992, totalled $1,585.94. The following calculation yields the same figure: Spehr's LES for May 1992 lists entitlements (basic pay, allowances,

---

5. In *Hamon,* which involved a serviceman discharged from the Coast Guard at the end of his enlistment term, the court ruled that the physical delivery of plaintiff's DD Form 214 two months later did not alter the legal effectiveness of plaintiff's prior separation from service. In discussing whether the delay constituted procedural error, the court quoted from *Kenon D. Shattuck and others,* 63 Comp.Gen. 251, 252 (1984) "To say .... that the untimely delivery of [DD Form 214] voided the discharge would not be in keeping with prior holdings which do not make the effective date of discharge depend upon delivery of documents when the parties are both aware and both intend to effect a discharge or separation on a given date." 10 Cl.Ct. at 684. See also *Willingham v. United States,* 35 Fed.Cl. 633, 647 (1996).

and unused leave) of $1,845.81. Subtracting the deductions of $259.87 for taxes and life insurance (*i.e.,* all deductions listed in the May 1992 LES except the $872.00 "special payment") leaves $1,585.94 (the amount of the two "special payments"). Thus, Kurt Spehr's "final pay" from the Coast Guard was $1,585.94, comprised of the net earnings from his last eight days of service plus the cash value of his unused annual leave. The initial check for $872.00, issued on April 27, 1992, represented a "substantial part" of Spehr's "final pay" from the Coast Guard, as required under 10 U.S.C. § 1168(a). The second check for $713.94, issued on June 4, 1992, represented the remaining balance of Spehr's "final pay," and was issued well within the 45 days promised in the Coast Guard's separation letter of May 8, 1992. Thus, plaintiff's claim that he did not receive all of his "final pay" from the Coast Guard is without merit.

*Summation of "wrongful discharge" and "ineffective discharge" claims:*

Plaintiff has not met the burden of proof in establishing that there was any material legal error or injustice in his administrative discharge proceeding or the subsequent BCMR review. Spehr has not submitted "cogent and clearly convincing evidence" of any such error, *Renicker, supra,* nor shown that the ultimate and final decision by the BCMR was "arbitrary, capricious, in bad faith .... or contrary to any applicable law, regulation or published procedure." *Wyatt, supra.* Furthermore, plaintiff has failed to demonstrate that the Coast Guard did not deliver his discharge certificate and final pay in accordance with the provisions of 10 U.S.C. § 1168(a). So there is no valid basis for Spehr's claim that his discharge on May 8, 1992 was legally ineffective. Accordingly, plaintiff's claims for back pay and allowances based on the alternative theories that he was either wrongfully discharged on May 8, 1992 (and thus entitled to back pay and allowances for the three weeks remaining on his enlistment term—*i.e.,* to May 29, 1992) or that he was never legally discharged (and thus entitled to back pay and allowances from May 8, 1992 up to the present) must both be denied.

## III.

In its two partial motions to dismiss, defendant asked the court to dismiss the rest of plaintiff's claims on jurisdictional grounds, either for lack of subject matter jurisdiction or failure to meet the Tucker Act's six-year limitation for filing. The Tucker Act provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. A claim accrues "when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir. 1988) (emphasis added). The six-year limitation period for instituting a claim against the United States is a jurisdictional requirement which cannot be waived by the court. See *Farrell v. United States,* 9 Cl.Ct. 757, 758–59 (1986).

Rule 12 of the Court of Federal Claims covers several grounds for dismissal of a claim, including "lack of jurisdiction over the subject matter," RCFC 12(b)(1), and "failure to state a claim upon which relief can be granted," RCFC 12(b)(4). Whether a court possesses subject matter jurisdiction, for the purposes of RCFC 12(b)(1), depends upon the "court's general power to adjudicate in specific areas of substantive law." *Palmer v. United States,* 168 F.3d 1310, 1313 (Fed.Cir. 1999). An action would be dismissible under RCFC 12(b)(1), for example, if it did not represent a claim for money or if it was brought pursuant to a statute that specifically granted jurisdiction to another judicial body. In other words, claims dismissible under RCFC 12(b)(1) for lack of subject matter jurisdiction are fatally flawed as a matter of law. By comparison, dismissal under RCFC 12(b)(4), for failure to state a claim upon which relief can be granted, "is appropriate when the *facts asserted by the claimant* do not under the law entitle him to a remedy." *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir.1998). (Emphasis added.) A ruling under RCFC 12(b)(4) constitutes an adjudication on the merits. See *Maniere v. United States,* 31 Fed.Cl. 410, 419

(1994). Thus, claims dismissible under RCFC 12(b)(4) are within the subject matter jurisdiction of the court, but are based on factual allegations which, even if true, do not provide grounds relief under the law.

In considering defendant's motion to dismiss, whether on the ground of lack of subject matter jurisdiction, RCFC 12(b)(1), or failure to state a claim on which relief can be granted, RCFC 12(b)(4), the court must construe the allegations of the complaint favorably to the plaintiff. See *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *White Mountain Apache Tribe v. United States,* 46 Fed.Cl. 20, 23 (1999). In addition, the court must accept as true any undisputed allegations of fact made by plaintiff. See *Haberman v. United States,* 26 Cl.Ct. 1405, 1410 (1992). Ultimately, however, the burden is on plaintiff to establish jurisdiction by a preponderance of the evidence. See *Reynolds v. Army & Air Force Exchange Service,* 846 F.2d 746, 748 (Fed. Cir.1988). In addition, if a party presents matters outside the pleadings, a dismissal under RCFC 12(b)(4) constitutes a ruling by summary judgment.[6] See *Maniere, supra,* 31 Fed.Cl. at 419.

### A.

■ Defendant seeks the dismissal of plaintiff's claim for reimbursement of travel and relocation expenses totalling $1,035.95, first presented to this court in December 2000, on the ground that it is barred by the six-year statute of limitations. Documentation furnished at that time indicate that this reimbursement claim was submitted to the Coast Guard on August 31, 1988, and "certified for payment" on September 19, 1988, though plaintiff asserts that he was never paid. The reimbursement claim was not part of the original complaint filed by plaintiff in U.S. district Court in August 1997, nor the amended complaint filed in the Court of Federal Claims in June 1999. Defendant argues that the court does not have jurisdiction to consider this claim because it was not asserted within the six-year limitation period set by the Tucker Act.

In the case at bar, all events allegedly fixing defendant's liability for reimbursing plaintiff's travel and relocation costs arose in 1988, when the claim was submitted by Kurt Spehr and certified for payment by the Coast Guard. That was 12 years before the claim was presented in this court. Plaintiff offers no explanation as to why he did not pursue this claim earlier. Indeed, plaintiff has provided no evidence, aside from his own affidavit 12 years after the events in question, that his travel and relocation costs were not in fact reimbursed by the Coast Guard in 1988. The record establishes that plaintiff forgot about other payments he received from the Coast Guard (like his two "final pay" checks in 1992), and he may well have forgotten about a reimbursement check in 1988 as well.[7] Unlike plaintiff's "ineffective discharge" claim, this reimbursement claim for travel and relocation expenses incurred in 1988 does not relate back to, or have anything to do with, Spehr's discharge from the Coast Guard in 1992 or his claims arising therefrom. So plaintiff cannot bootstrap the reimbursement claim onto his original pleading in this litigation. Thus, Spehr's claim for allegedly unreimbursed travel and relocation expenses was not filed within six years of accrual, as required by 28 U.S.C. § 2501. Accordingly, the court must dismiss the claim for lack of jurisdiction.

■ The same analysis applies to plaintiff's claim for medical treatment and addi-

---

6. RCFC 12(b)(4) provides that "If, on a motion asserting the defense numbered (4) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

7. The Coast Guard has been unable to locate any documentation pertaining to the claim, which is not surprising considering the now 13–year lapse in time. So defendant also has a valid laches defense. The Federal Circuit has held that laches is applicable in a military pay case where (1) a plaintiff unreasonably and inexcusably delays bringing a claim and (2) the Government is prejudiced by the delay, thereby rendering the Government unable to "mount a defense." *Cornetta v. United States,* 851 F.2d 1372, 1377–78 (1988) (*en banc* ).

tional pay, under 14 U.S.C. § 366, based on the cancerous skin condition diagnosed and treated in April 1992. This claim and accompanying documentation was first presented to the court in plaintiff's reply brief filed on October 4, 2001, nine and a half years after Spehr's administrative discharge on May 8, 1992, the date which fixes the accrual of Spehr's claim. "[A] claim based on an alleged unlawful discharge from the military service accrues on the date of discharge." *Hurick v. Lehman,* 782 F.2d 984, 986 (Fed. Cir.1986). The administrative record, previously compiled, is devoid of evidence or any mention of the basal cell carcinoma, and plaintiff has offered no explanation for the delay in presenting the claim. Nor has plaintiff established any nexus between this medical condition and the "personality disorder" that was the basis for his administrative discharge in 1992. Thus, the new claim for medical treatment and additional pay based on the basal cell carcinoma does not relate back to, or have anything to do with, Spehr's discharge from the Coast Guard in 1992 and his claims arising therefrom. Accordingly, the claim was not filed within six years of accrual, as required by 28 U.S.C. § 2501, and must be dismissed by the court for lack of jurisdiction.[8]

### B.

Since the court considered matters outside the pleadings in its summary judgment ruling for defendant that plaintiff was not wrongfully discharged from the Coast Guard and not entitled to any award for back pay and allowances, all other claims ancillary to the alleged wrongful discharge can likewise be disposed of by summary judgment under RCFC 56, in accordance with RCFC 12(b)(4). Thus, plaintiff's request that the court void his administrative discharge as illegal and based on "fraud" (and remove the bar to his reenlistment) must be dismissed, as the court

has specifically found that the discharge was legal. Nor is Spehr entitled to "interim advancements" or retirement as an E–9 (or the reissuance of his uniform) for the self-evident reason that he has not been an enlisted member of the Coast Guard since May 1992. "Absent the violation of a statute or regulation entitling a service member to a promotion as a matter of law, the [Court of Federal Claims] has no authority to entertain [such a] claim." *Thomas v. United States,* 42 Fed.Cl. 449, 452 (1998) (quoting *Voge v. United States,* 844 F.2d 776, 780 (Fed.Cir. 1988), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988)).

Plaintiff cites the Rehabilitation Act of 1973, P.L. 93–112, 87 Stat. 390 (September 26, 1973), 29 U.S.C. § 791(b) and 38 U.S.C. § 4214(c), as a basis for his claim that the Coast Guard discriminated against him by not transferring him to a civilian position. The act provides for affirmative action plans in federal government agencies to hire individuals with disabilities. In further support of his discrimination claim, plaintiff refers to another statutory provision, 18 U.S.C. § 245(b)(1)(B) and (C), which prescribes civil and criminal penalties against anyone who injures, intimidates or interferes with another person's participation in a federal program or employment in a federal agency. Neither of these two laws, however, confers a substantive right to recover money damages against the United States. The same legal shortcoming applies to plaintiff's myriad claims for assistance from the Coast Guard in securing him civilian employment, reimbursement for medical insurance premiums paid and housing costs incurred since his discharge in 1992, reconsideration of his eligibility for service-related awards from the Coast Guard, and the request "for a complete neurological testing denied unlawfully," according to plaintiff, "prior to discharge."

---

8. The pertinent statute, 14 U.S.C. § 366, does not appear to offer plaintiff an avenue of relief in any event. It provides that an enlisted Coast Guard member in need of medical care and hospitalization due to a physical malady "may" be retained in the service beyond his enlistment term. This wording clearly does not mandate the Coast Guard to retain any such person. Furthermore, the statute envisions providing a serviceman hospitalization or medical care "until he shall have recovered to .... enable him to meet the physical requirements for reenlistment ..." Since the Coast Guard had no intention of reenlisting Spehr, it would have had no reason to invoke the statute. Lastly, nothing in the statute can be read as giving a serviceman the option of invoking it, unilaterally, in his own behalf.

Plaintiff has cited no money-mandating provisions of law—whether Constitutional, statutory, regulatory or contractual—underpinning these claims, as required to recover damages against the United States in this court. See *Testan, supra,* 424 U.S. at 398, 96 S.Ct. 948. Therefore, the court must dismiss the above claims pursuant to RCFC 12(b)(1) for "lack of jurisdiction over the subject matter."

Plaintiff invokes a couple of other statutes as bases for his discrimination claim(s) against the Government. They include: (1) P.L. 93–508, 88 Stat. 1578 at 1601, Title V, Section 503, 38 U.S.C. § 1652 Note (December 3, 1974), an act whose purpose, *inter alia,* was to increase vocational, educational and training assistance to eligible veterans through amendments to 38 U.S.C. §§ 1652(A)(3), 1661, 1673, and 38 U.S.C. Chapter 41; and (2) P.L. 102–127, 105 Stat. 622, Section 4, the "Veterans' Educational Assistance Amendments of 1991," codified at 38 U.S.C. § 101 Note. Plaintiff has submitted no evidence of his entitlement to relief under these statutes, however, nor evidence that he was denied any assistance thereunder to which he might have been entitled. In particular, plaintiff has failed to show that either of these laws is a money-mandating statute on which to base a claim for money damages against the United States in this court. The claims must therefore be dismissed.

The court also lacks subject matter jurisdiction over plaintiff's claims based on "due process" violations under the 5th and 14th amendments to the Constitution, because these are not money-mandating provisions. See *Montalvo v. United States,* 231 Ct.Cl. 980, 982–83, 1982 WL 25825 (1982). As sub-elements of his "due process" claims, plaintiff's claims for compensation based on "unlawful harassment" at work and additional "special damages" (by which Spehr presumably means punitive damages) represent tort actions which are specifically excluded from this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1). The Tucker Act limits the jurisdiction of the Court of Federal Claims to claims "for liquidated or unliquidated damages in cases *not sounding in tort.*" *Id.* (emphasis added). See *Cottrell v.*

*United States,* 42 Fed.Cl. 144, 149 (1998). Accordingly, plaintiff's claims for Constitutional "due process" and tort violations must be dismissed by the court for lack of subject matter jurisdiction under RCFC 12(b)(1).

Plaintiff's final claim—for attorney fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(b)—must also be denied. A fundamental condition for recovery under the EAJA is that the plaintiff be the prevailing party in the case. *Id.* Kurt Spehr has not prevailed in any part of this action. Accordingly, there is no legal basis for the court to grant him an award for attorney fees.

### CONCLUSION

For the reasons discussed above, the court finds no merit to any of plaintiff's claims in this action. Accordingly, the court hereby:

(1) DENIES all three of plaintiff's motions for summary partial judgment,

(2) GRANTS defendant's cross-motion for partial summary judgment with respect to the claim for back wages, allowances, and other claims ancillary to the alleged wrongful or ineffective discharge,

(3) GRANTS defendants's partial motion to dismiss with respect to all other claims presented by the plaintiff in this action.

The clerk is ordered to enter judgment DISMISSING the complaint in its entirety. Each party shall bear it own costs.